**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRIAN RICHARDSON, MICHELLE HUNT, JOHN WHITE AND JACQUELINE BOWSER,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| **v.** | |
| **VERDE ENERGY USA, INC.,** | **NO. 15-6325** |
| **Defendant.** | |

## OPINION

This case concerns unwanted telemarketing calls and the technology used to make those calls. Plaintiffs—Brian Richardson, Michelle Hunt, Jacqueline Bowser, Kris Villiger, and Donna Schley—are five individuals who received promotional calls from a firm advertising Verde Energy USA, Inc.'s ("Verde") low-priced electricity. Plaintiffs now propose two nation-wide class actions against Verde claiming those calls violated various provisions of the Telephone Consumer Protection Act of 1991 (TCPA), 47 U.S.C. § 227, which regulates over-the-phone marketing. Before the Court are Verde's motions for partial summary judgment and to strike Plaintiffs' class allegations

For the reasons set forth below, Defendant's motions are granted in part and denied in part.

### I.     Facts

Verde offers consumers "low-priced electricity" through telemarketing firms it hires to contact potential customers. Defendant's telemarketing campaign worked as follows. Defendant hired an advertising company, Fluent, Inc., to generate "customer leads." Various websites operated by Fluent prompted visitors to register for cash promotions by providing their

personal contact information—including, name, physical address, email address, and telephone number. The final step of the registration process required visitors to complete a "TCPA consent form" that stated: "By checking the box below I consent to receive phone sales calls and text messages . . . from [Fluent's] Marketing Partners." Fluent provided registered users' contact information to Verde, which passed the contact information on to Transparent BPO, Inc., a telemarketing firm that operated several outbound call centers. Transparent BPO then marketed Verde's service to potential customers, using telecommunications software from CallShaper, LLC—specifically, CallShaper's predictive dialing platform (hereinafter "CallShaper Predictive Dialer").

The operation of the CallShaper Predictive Dialer is at the heart of this dispute. All parties agree that Transparent BPO used the CallShaper Predictive Dialer to call Plaintiffs' cellular phones to market Defendant's service. Each Plaintiff received multiple calls, totaling seventy-five in all. It is further undisputed that the CallShaper Predictive Dialer allowed Transparent BPO to "load lists of targeted leads to be called" and call those numbers.

From there, the parties diverge. Specifically, the parties disagree as to whether the CallShaper Predictive Dialer had the inherent capability to produce telephone numbers to be called using a random or sequential number generator. The parties also dispute several details concerning the calls placed using the CallShaper Predictive Dialer—most notably, whether the calls were delivered with an artificial or pre-recorded message.

## II.    Summary Judgment Standard

Summary judgment must be granted to a moving party if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). Material facts are

determined by reference to the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute "exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *U.S. ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 93 (3d Cir. 2018).

When the moving party's version of events differs substantially from the non-moving party's version, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). But, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

## III. Motion for Partial Summary Judgment

To address Verde's arguments with respect to its motion for partial summary judgment, it is necessary to first review the history of the TCPA and its interpretation by the Federal Communications Commission (FCC), which has authority to promulgate regulations concerning the Act. Congress enacted the TCPA in 1991 to address consumers' concerns about undesired robocalls. *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 691 (D.C. Cir. 2018). To that end, the statute makes it unlawful to place:

> any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system ["ATDS"] or an artificial or prerecorded voice to any number assigned to a . . . cellular telephone service.

47 U.S.C. § 227(b)(1)(A)(iii), (B). The TCPA thus "generally makes it unlawful to call a cell phone using an ATDS," *ACA Int'l*, 885 F.3d at 693, or an artificial or prerecorded voice. There

is, however, one exception relevant here: Calls made with "prior express consent" are not violations of the TCPA. 47 U.S.C. § 227(b)(1). To facilitate enforcement, the TCPA provides a private right of action with statutory damages of $500 per call made in violation of the statute, and treble damages for a knowing or willful violation. *Id.* at § 227(b)(3).

Verde's summary judgment argument is threefold. First, Verde argues that the CallShaper Predictive Dialer is not an ATDS as defined by the TCPA, and thus does not fall within the statute's reach. Second, Verde claims that its calls were made with a live voice, so Plaintiffs' claims should be dismissed to the extent they are premised on calls being delivered using an artificial or prerecorded voice. Third, Verde contends that, whatever the merits of the first two arguments, Richardson's claims should be dismissed because he provided "prior express consent" to be called by Verde.

## A. Whether the CallShaper Predictive Dialer is an ATDS.

The first issue, then, is whether the CallShaper Predictive Dialer qualifies as an ATDS— sometimes also referred to as an "autodialer." That question, in turn, requires the Court to determine whether technology—like the CallShaper Predictive Dialer—"must *itself* have the ability to generate random or sequential telephone numbers to be dialed," or whether it would be "enough if the device can call from a database of telephone numbers generated elsewhere." *ACA Int'l*, 885 F. 3d at 701.

### 1. Statutory & Regulatory Background

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Thus, an ATDS is: "equipment with the 'capacity' to perform each of two enumerated functions: (i) storing or

producing telephone numbers 'using a random or sequential number generator' and (ii) dialing those numbers." *ACA Int'l*, 885 F. 3d at 693.

The FCC has issued several declaratory rulings seeking to clarify what qualifies as an ATDS. In 2003, the FCC issued a declaratory ruling to address the proliferation of "more sophisticated dialing systems, such as predictive dialers" that were "widely used by telemarketers to increase productivity." *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14090 (2003) ("2003 Order"). The FCC explained that a predictive dialer is calling equipment programmed so that "the dialer calls [numbers] at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call." *Id.* at 10491. "The principle feature of predictive dialing software is a timing function, not number storage or generation." *Id.* Nevertheless, the FCC determined that predictive dialers qualified as ATDSs because "the hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." *Id.*

The FCC explicitly reaffirmed this position in a 2008 declaratory ruling. *See In Re of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 566 (2008) ("2008 Order"). Rejecting a petition from an industry group challenging the 2003 Order, the FCC explained: "[W]e affirm that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *Id.*

In 2015, the FCC felt obliged to revisit the definition of an ATDS due to the "rise in complaints, litigation, and petitions" concerning unwanted telemarketing calls. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7970 (2015) ("2015 Order"). The 2015 Order "reiterate[d] that predictive dialers, as previously described by

the Commission satisfy the TCPA's definition of autodialer." *Id*. at 7971-72 (citing the 2003 and 2008 Orders).

The 2015 Order went further, however, and explained that an ATDS's "capacity to store or produce telephone numbers to be called, using a random or sequential number generator" was "not limited to its current configuration." *Id.* at 7974. Rather, an ATDS's "capacity" also "includes its potential functionalities." *Id.* at 7974. Thus, the 2015 Order provided that: "[A]utodialers need only have the 'capacity' to dial random and sequential numbers, rather than the 'present ability' to do so. Hence, any equipment that has the requisite 'capacity' is an autodialer and is therefore subject to the TCPA." *Id.*

### 2. *ACA International*

Several industry groups representing collection agencies challenged the 2015 Order, arguing, in part, that the FCC's broad definition of an ATDS was arbitrary and capricious. In *ACA International*, the D.C. Circuit consolidated the various petitions and reviewed the 2015 Order under the Administrative Procedure Act. 85 F.3d at 703.

Ultimately, the D.C. Circuit struck down the 2015 Order's definition of an ATDS. *Id.* at 695. As the court of appeals explained, the statutory definition of an ATDS "naturally raises two questions: (i) when does a device have the 'capacity' [to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers]; and (ii) what precisely are those functions?" *Id.* The D.C. Circuit found 2015 Order's "approach to those two questions [could not] be sustained." *Id.*

First, the D.C. Circuit concluded that the 2015 Order's interpretation of "capacity" was overbroad. According to the D.C. Circuit, "a straightforward reading of the [FCC's] ruling invites the conclusion that all smartphones are autodialers," *id.* at 699, because the 2015 Order

defined "a device's capacity [to] include[] functions that could be added through app downloads" and "smartphone apps can introduce ATDS functionality into the device." *Id.* at 697. But, "[i]t is untenable to construe the term 'capacity' in the statutory definition of an ATDS in a manner that brings within the definition's fold the most ubiquitous type of phone equipment known, used countless times each day for routine communications by the vast majority of people in the country,"—that is, "[i]t cannot be the case that . . . nearly every American is a TCPA-violator-in-waiting, if not a violator-in-fact." *Id.* at 698. Thus, the D.C. Circuit concluded the 2015 Order's interpretation of a device's capacity was "an unreasonably, and impermissibly, expansive one." *Id.* at 700.

Second, the D.C. Circuit concluded that the portion of the 2015 Order "describing the functions a device must perform to qualify as an autodialer, fail[ed] to satisfy the requirement of reasoned decisionmaking." *Id.* at 704. The court of appeals explained that "[a] basic question raised by the statutory definition is whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed," or whether it would be "enough if the device can call from a database of telephone numbers generated elsewhere." *Id.* at 701. The 2015 Order, however, gave "no clear answer" on this critical question. *Id.* at 703. At certain points, the 2015 Order indicated that "a device qualif[ied] as an ATDS only if it c[ould] generate random or sequential numbers to be dialed." *Id.* at 702. At other points, though, the 2015 Order indicated that a device was an ATDS "even if it lack[ed] that capacity." *Id.* at 703. While "[i]t might be permissible for the Commission to adopt either interpretation," the D.C. Circuit determined that the FCC could not "espouse both competing interpretations in the same order." *Id.* Because the 2015 Order's "lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the [FCC's] expansive understanding of when a

device has the 'capacity' to perform the necessary functions," the court of appeals "set aside the [FCC's] treatment of those matters." *Id.*

The D.C. Circuit therefore invalidated the 2015 Order's definition of an ATDS, rendering it no longer binding in the Third Circuit or on this Court.[1]

### 3. Impact of *ACA International*

While all agree that *ACA International* invalidated the portion of the 2015 Order's definition of an ATDS, the decision left two critical questions unanswered: (1) whether the invalidation of that portion of the 2015 Order necessarily invalidated the analogous portions of the 2003 and 2008 Orders concerning predictive dialers, and (2) in the absence of the 2015 Order, what functions must calling equipment possess to qualify as an ATDS.

While the parties—as well as various federal courts—diverge on both questions, the Third Circuit has had little opportunity to address them. Only two Third Circuit opinions—one unpublished—have considered whether a particular piece of calling equipment qualified as an ATDS, both of which were issued in a single case. *See Dominguez v. Yahoo, Inc.*, 629 F. App'x 369 (3d Cir. 2015) ("*Dominguez I*"); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018) ("*Dominguez II*").[2] The issue in the *Dominguez* cases was whether Yahoo violated the TCPA by sending the plaintiff thousands of unsolicited text messages through an alleged ATDS. The non-precedential opinion in *Dominguez I* was issued after the promulgation of the 2015 Order, but

---

[1] Under the Hobbs Act, the Federal Court of Appeals "has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the [FCC]." 28 U.S.C. § 2342. "When agency regulations are challenged in more than one court of appeals, 28 U.S.C. § 2112 requires that the panel on multidistrict litigation consolidate the petitions and assign them to a single circuit." *MCI Telecomms. Corp. v. U.S. W. Commc'ns*, 204 F.3d 1262, 1267 (9th Cir. 2000). Here, the *ACA International* plaintiffs filed timely challenges, which were then consolidated and assigned to the D.C. Circuit. The D.C. Circuit then became "the sole forum for addressing . . . the validity of the FCC's" order. *Id.*

[2] In *Manuel v. NRA Group LLC*, 722 F. App'x 141 (3d Cir. 2018), the petition challenged the district court's conclusion as to what calling equipment qualified as an ATDS, but the Third Circuit determined that the petitioner had waived the issue by failing to timely raise it below. *Id.* at 147.

before the decision in *ACA International*. *Dominguez I*, 629 F. App'x at 371. Thus, *Dominguez II* is the only post-*ACA International* decision from the Third Circuit. Even so, the guidance provided by *Dominguez II* as to the continuing validity of the 2003 and 2008 Orders, and what qualifies as an ATDS is, at times, ambiguous. The Court will endeavor to address both issues in light of the guidance the *Dominguez* cases provide.

*i.  Continuing Validity of the 2003 and 2008 Orders*

The parties—and courts—split as to whether the invalidation of the 2015 Order necessarily invalidated the 2003 and 2008 Orders as well. On the one hand, Plaintiffs suggest that the invalidation of the 2015 Order had no effect on the 2003 and 2008 Orders, such that the earlier Orders remain binding on federal courts. The majority of lower courts have held the same. *See Ammons v. Ally Fin., Inc.*, 362 F.Supp.3d 578, 587 (M.D. Tenn. 2018); *Reyes v. BCA Fin. Servs., Inc.*, 312 F.Supp.3d 1308, 1320-21 (S.D. Fla. 2018); *Pieterson v. Wells Fargo Bank, N.A.*, 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018);; *McMillion v. Rash Curtis & Assocs.*, 2018 WL 3023449, at *3 (N.D. Cal. June 18, 2018); *Maddox v. CBE Grp., Inc.*, 2018 WL 2327037, at *4 (N.D. Ga. May 22, 2018); *Swaney v. Regions Bank*, 2018 WL 2316452, at *1 (N.D. Ala. May 22, 2018).

On the other hand, Defendant argues that by invalidating the 2015 Order, the D.C. Circuit necessarily invalidated the 2003 and 2008 Orders as well. Both the Ninth and Second Circuits, as well as a minority of federal district courts, have adopted this position. *See Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049 (9th Cir. 2018); *King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018); *Pinkus v. Sirius XM Radio, Inc.*, 319 F.Supp.3d 927, 935 (N.D. Ill. 2018); *Sessions v. Barclays Bank Del.*, 317 F.Supp.3d 1208 (N.D. Ga. 2018); *Gonzalez v. Ocwen Loan Servicing, LLC*, 2018 WL 4217065, at *5 (M.D. Fla. Sept. 5, 2018); *Gary v. TrueBlue, Inc*,

2018 WL 3647046, at *5 (E.D. Mich. Aug. 1, 2018).

The Third Circuit, however, has not taken a definite position on the continuing validity of the 2003 and 2008 Orders. As noted, the only post-*ACA International* decision addressing the statutory definition of an ATDS is *Dominguez II*. There, after acknowledging the invalidation of the 2015 Order, the court of appeals stated—somewhat cryptically—that "[i]n light of the D.C. Circuit's holding" in *ACA International*, "we interpret the statutory definition of an autodialer *as we did prior to the issuance of the 2015 Declaratory Ruling*." *Dominguez II*, 894 F.3d at 119 (emphasis added). But, what that means is unclear. Prior to the *Dominguez* case, the Third Circuit had never interpreted the statutory definition of an ATDS. As for *Dominguez I*, the Third Circuit in that non-precedential opinion purported to rely upon the 2015 Order's definition of an ATDS and thus would not be instructive after *ACA International*. *See Dominguez I*, 772 F. App'x at 372. Nevertheless, the Third Circuit in *Dominguez II* neither discussed nor cited the 2003 and 2008 Orders, leaving open whether those Orders remain binding within the circuit. Given the confusion over what, if anything, *Dominguez II* means for the continuing viability of the 2003 and 2008 Orders, an independent analysis concerning the binding effect of the 2003 and 2008 Orders is necessary.[3]

A careful parsing of *ACA International* indicates that the invalidation of the 2015 Order necessarily invalidated the 2003 and 2008 Orders as well. Recall that the D.C. Circuit found the 2015 Order arbitrary and capricious because it gave "no clear answer," *ACA Int'l*, 885 F.3d at

---

[3] Federal courts are divided in their interpretation of *Dominguez II*. The Ninth Circuit cited the decision in support of the proposition that *ACA International* set aside the 2003 and 2008 Orders. *Marks*, 904 F.3d at 1049. A district court in the District of New Jersey understood *Dominguez II* to have held that "the 2003 FCC Order was not overruled." *Sieleman v. Freedom Mortg. Corp.*, 2018 WL 3656159, at *3 (D.N.J. Aug. 2, 2018). Still another district court in the District of New Jersey discussed *Dominguez II* and then conducted an independent analysis as to whether the 2003 and 2008 FCC Orders remain intact. *Flemming v. Associated Credit Servs., Inc.*, 2018 WL 4562460, at *7-8 (D.N.J. Sept. 21, 2018) (deciding the earlier orders were no longer valid) (citing *Pinkus*, 319 F.Supp.3d at 935).

703, as to the critical question of "whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed," or whether it would be "enough if the device can call from a database of telephone numbers generated elsewhere." *Id.* at 701. In *ACA International*, the D.C. Circuit explained that, in their determination that all predictive dialers qualified as ATDS, the 2003 and 2008 Orders were similarly inconsistent as to this basic question. *Id.* at 702-03.

The D.C. Circuit pointed out that the 2003 Order "suggested it saw a difference between calling from a list of numbers, on one hand, and 'creating and dialing' a random or arbitrary list of numbers, on the other hand." *Id.* at 702; *see also* 2003 Order, 18 F.C.C.C. Rcd. at 14091. And yet, the 2003 Order also "made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS." *ACA Int'l*, 885 F.3d at 702; *see also* 2003 Order, 18 F.C.C.C. Rcd. at 14091 n.432, 14093. The 2003 Order—like its successor the 2015 Order—thus provided "no clear answer," *ACA Int'l*, 885 F.3d at 703, as to the critical question of whether a predictive dialer "must *itself* have the ability to generate random or sequential telephone numbers to be dialed," or whether it would be "enough if the device can call from a database of telephone numbers generated elsewhere," *id.* at 701. Instead, the 2003 Order suggested either set of "competing interpretations," *id.* at 702, would satisfy the statutory definition of an ATDS—a middle-ground position the D.C. Circuit deemed arbitrary and capricious in *ACA International*. *Id.* at 702-03.

Thus, the D.C. Circuit's "concern that the FCC in the [2015 Order] 'fail[ed] to satisfy the requirement of reasoned decisionmaking' due to the agency's 'lack of clarity about which functions quality a device as an autodialer' . . . applies with equal force to the 2003 Order['s]"

definition of which functions qualify a device as a proscribed predictive dialer. *Pinkus*, 319 F.Supp.3d at 935 (quoting *ACA Int'l*, 885 F.3d at 703). And the same concern "applies as well to the [2008 Order], which simply 'affirmed the understanding of ATDS articulated in the 2003 Order.'" *Id.* (quoting 2008 Order, 23 FCC Rcd. at 566) ("We affirm that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."). The invalidation of the 2015 Order therefore necessarily invalidated the 2003 and 2008 Orders as well "to the extent they express the same understanding" as the 2015 Order that "all predictive dialers qualify as ATDSs." *Id.* The 2003 and 2008 Orders are therefore invalid and no longer binding on this Court as to whether predictive dialers qualify as ATDSs.

### ii. *Predictive Dialers under the TCPA*

While the *ACA International* decision invalidated the 2015 Order, and by implication the 2003 and 2008 Orders, the decision did not adopt a definitive position as to what calling technology qualified as an ATDS. In the absence of binding agency interpretation, the Court must "begin anew to consider the definition of ATDS under the TCPA." *Marks*, 904 F.3d at 1050-51.

To revisit the statutory language, the TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).[4] In interpreting the statute, both the parties and courts diverge on the critical question of "whether a device must *itself* have the ability to generate random or sequential telephone numbers to be

---

[4] The parties, along with all the federal courts to interpret the statute, agree that devices that, as currently configured, produce and then dial numbers produced by a random or sequential number generator qualify as ATDSs. *See Marks*, 904 F.3d at 1050; *Pinkus*, 319 F.Supp.3d at 937.

dialed," or whether it would be "enough if the device can call from a database of telephone numbers generated elsewhere." *ACA Int'l*, 885 F.3d at 701. The divergence turns on different interpretations of the statutory language: "to store or produce telephone numbers to be called, using a random or sequential number generator." Specifically, the parties disagree over whether the adverbial clause "using a random or sequential number generator" modifies both verbs—"to store" and "to produce"—or just the singe verb "to produce."

Plaintiffs argue the clause only modifies the verb "to produce," and not the verb "to store," because a device that stores telephone numbers has no use for "a random or sequential number generator." On Plaintiffs' reading, an ATDS is "equipment which has the capacity (A) to [i] store [telephone numbers to be called] or [ii] produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." Thus, a predictive dialer that only had the capacity to store and then dial numbers—but not to randomly generate numbers—would still qualify as an ATDS. Put differently, Plaintiffs argue it is "enough [that] the device can call from a database of telephone numbers generated elsewhere." *ACA Int'l*, 885 F.3d at 701.

Verde, however, contends the clause "using a random or sequential number generator" modifies both verbs: "to produce" and "to store." The adverbial clause, Defendant argues, indicates which numbers are to be stored and then called: those generated using a "random or sequential number generator."[5] Thus, Defendant reads the statute to define an ATDS as either (1) "equipment which has the capacity to store telephone numbers to be called, *the numbers to be*

---

[5] That is, the clause "refers to the numbers themselves rather than the manner in which they are dialed." *Dominguez I*, 629 F. App'x at 372; *see also Pinkus*, 319 F.Supp.3d at 938 (explaining that, because numbers "must necessarily 'be called in *some* order—either in a random or some other sequence,'" the adverbial phrase "is best understood to describe the process by which those numbers are generated") (quoting *ACA International*, 885 F.3d at 702).

*generated* using a random or sequential number generator" or (2) "equipment which has the capacity to produce telephone numbers to be called, *the numbers to be generated* using a random or sequential number generator." On Defendant's reading, to be an ATDS, equipment "must *itself* have the ability to generate random or sequential telephone numbers to be dialed," *ACA Int'l*, 885 F.3d at 701—a predictive dialer that merely stores and then dials numbers would not qualify as an ATDS because it cannot generate random or sequential numbers.

Neither interpretation of the statutory language is fully satisfactory. On the one hand, the punctuation canon, which provides that "where there is a comma before a modifying phrase, that phrase modifies all of the items in a series and not just the immediately preceding item," *Stepnowski v. C.I.R.*, 456 F.3d 320, 324 (3d Cir. 2006)—renders it unlikely that the adverbial phrase modifies only "to produce" and not "to store," as Plaintiff contends. *Pinkus*, 319 F.Supp.3d at 938. On the other hand, Defendant's construction requires massaging the statutory language to arrive at the conclusion it prefers, *i.e.* that "to store telephone numbers to be called, using a random or sequential number generator" refers to storing telephone numbers which are generated using a random or sequential number generator. *Marks*, 904 F.3d at 1052, n.8.

If the Court were writing on a blank slate, it would likely follow the course chartered by the Ninth Circuit in *Marks*, which observed: "After struggling with the statutory language [of the TCPA] ourselves, we conclude that it is not susceptible to a straightforward interpretation based on the plain language alone. Rather, the statutory text is ambiguous on its face." *Marks*, 904 F.3d at 1051. The Ninth Circuit then looked to the "context and structure of the statutory scheme" and concluded that "language in the statute indicates that equipment that made automatic calls from lists of recipients was also covered by the TCPA." *Id.* at 1051. That is, the Ninth Circuit held that calling equipment qualified as an ATDS even "if the device can [only]

call from a database of telephone numbers generated elsewhere," *ACA Int'l*, 885 F.3d at 701.

The Court, however, is not writing on a blank slate. In *Dominguez II*, the Third Circuit held, albeit implicitly, that "a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed," *id.*; *see also Marks*, 904 F.3d at 1052, n.8 (declining "to follow the Third Circuit's [] assumption that a device must be able to generate random or sequential numbers in order to qualify as an ATDS") (citing *Dominguez II,* 894 F.3d at 120). As noted, in *Dominguez II* the Third Circuit was presented with the question of whether Yahoo's text messaging service qualified as an ATDS. *Dominguez II,* 894 F.3d at 121. After discussing the technology at issue, the Third Circuit held that summary judgment was appropriate because the evidence did not "create[] a genuine dispute of fact as to whether [Yahoo's messaging service] had the present capacity to function as an autodialer *by generating random or sequential telephone numbers and dialing those numbers*." 894 F.3d at 121 (emphasis added). According to the Third Circuit, then, the ability to generate random or sequential telephone numbers is necessary for a device to qualify as an ATDS. Indeed, the court of appeals went on to observe that "the record indicates that [Yahoo's messaging service] sent messages only to numbers that had been individually and manually inputted into its system by a user," *id.*, further indicating that a device that merely has the capacity to store and dial numbers that have been inputted into the equipment does not qualify as an ATDS. Thus, *Dominguez II* stands for the proposition that, to qualify as an ATDS, calling equipment must have the capacity to generate numbers using a random or sequential number generator and then call those numbers.

Because this Court is bound to follow the holding of *Dominguez II*, which includes "besides the facts and the outcome, the reasoning essential to that outcome," *Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 582 (7th Cir. 2005) (Posner, J.), the Court concludes that a

15

predictive dialing device that merely dials numbers from a stored list of numbers—rather than having generated those numbers either randomly or sequentially—is not an ATDS.

### 4. Application

Turning to the facts of this case, Defendant argues that the CallShaper Predictive Dialer is not an ATDS because the equipment, as currently configured, only has the capacity to store and call telephone numbers manually uploaded. That is, the CallShaper Predictive Dialer "has no feature to store or produce telephone numbers to be called using a random or sequential number generator." As discussed above, equipment that only has the capacity to store and call telephone numbers manually uploaded is not an ATDS.

Plaintiffs argue, though, that there remains a genuine issue of material fact as to whether the CallShaper Predictive Dialer can, in fact, produce numbers to be called using a random or sequential number generator. The only evidence Plaintiffs introduce for this proposition is testimony from telecommunications consultant Randall A. Snyder, who claims that the "CallShaper maintains technology within its platform to generate random numbers." The Third Circuit in *Dominguez II*, however, upheld a district court's exclusion of a nearly identical report from the same expert on this precise issue. 894 F.3d at 120. The Third Circuit explained that the Snyder report in *Dominguez II*, like the report here, "explain[ed] the role that random number generators play in various commonly available computer operating systems . . . and posits that 'it is a straightforward and very basic algorithm to use the available random number generation functions to generate ten-digit telephone numbers.'" *Id.* "Notably absent" from Snyder's declaration, however, was "an explanation of how the [Yahoo messaging system] actually did or could generate random telephone numbers to dial." The Third Circuit concluded that the report did not create a genuine dispute of material fact because it "d[id] not shed light on the key factual

question actually at issue in this case—whether the [Yahoo messaging system] functioned as an autodialer." *Id.* at 121.

The same flaw is fatal to Plaintiffs' argument.[6] Snyder's report contains "overbroad, generalized assertions," *id.* at 120, about the ability of computer programs to generate random numbers generally. Absent from the report, though, is an explanation of how the CallShaper Predictive Dialer "actually did" generate random telephone numbers to dial. *Id.* at 121. Because the report "does not shed light on the key factual question actually at issue in this case—whether the [CallShaper Predictive Dialer] functioned as an autodialer by randomly or sequentially generating telephone numbers, and dialing those numbers," the report does not create a genuine dispute of fact as to whether the equipment "had the capacity to function as an autodialer." *Id.*

Defendant's motion for partial summary judgment will therefore be granted on Plaintiffs' claims to the extent that they are based on the alleged use of an ATDS.

### B. Whether Defendant Delivered Artificial or Prerecorded Calls.

Recall that in addition to prohibiting most calls made by an ATDS to cellular phones, the TCPA also prohibits calls made "using . . . an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). Defendant moves for partial summary judgment on Plaintiffs' claims that they received calls regarding Defendant's service using an artificial or prerecorded voice.

Plaintiffs concede that, of the seventy-five calls made to their phones, three calls—those placed on October 26, 2015 to Hunt; on May 13, 2016 to Villiger; and on November 18, 2015 to

---

[6] Although there is no motion to exclude Snyder's report before the Court, as there was before the district court in *Dominguez v. Yahoo!, Inc.,* 2017 WL 390267, at *1 (E.D. Pa. Jan. 27, 2017), the Third Circuit's decision is nevertheless binding because the district court in *Dominguez* determined that "even if the expert reports"—including Snyder's report—"were admissible, they d[id] not create a genuine dispute of material fact so as to prevent summary judgment." *Id.* at *20. Also, the apparent oddity of a litigant submitting a nearly identical expert report to one that has already been deemed inadmissible is explained by the fact that this case was stayed while *Dominguez I* and *Dominguez II* were decided.

Bowser—were not made with an artificial or prerecorded voice. Thus, no issue of material fact exists as to whether those three calls violated Section 227(b)(1)(A) of the TCPA; they do not.

A genuine issue of material fact does exist, however, as to whether the remainder of Defendant's calls to Plaintiffs were delivered with an artificial or prerecorded voice. Of the seventy-five calls made to Plaintiffs' phones, Defendant produced audio recordings for twenty-three, some of which were only partial recordings of the call. And while Defendant claims that all calls made to Plaintiffs were delivered by a live voice, Plaintiffs introduced testimony that at least some calls utilized an artificial or prerecorded voice. Indeed, a witness for the Defendant testified that, when a live agent is not available to take the call within two seconds of a person picking up a call, then "a message is played" that "identifies . . . that the call is being made by Verde Energy." Thus, a genuine issue of material fact exists as to how many, if any, of the remaining seventy-two calls made to Plaintiffs were delivered with an artificial or recorded voice.[7]

Defendant's motion for partial summary judgment will be granted as to the calls placed on October 26, 2015 to Hunt, on May 13, 2016 to Villiger, and on November 18, 2015 to Bowser; the motion will be denied as to all other calls Defendant made to Plaintiffs.

---

[7] Defendant argues that the use of an artificial or prerecorded message is permitted in certain limited instances as defined by FCC regulation 47 C.F.R. § 64.1200(a)(7)(i), which provides:

> Whenever a live sales representative is not available to speak with the person answering the call, within two (2) seconds after the called person's completed greeting, the telemarketer or the seller must provide [a] prerecorded identification and opt-out message that is limited to disclosing that the call was for "telemarketing purposes" and states the name of the business. . . on whose behalf the call was placed.

> True enough, but Defendant has not shown that any of the disputed calls fall within the ambit of Section 64.1200(a)(7)(i). That is, Defendant has introduced no evidence purporting to show that the calls at issue here used a prerecorded voice because a live sales representative was not available to speak with Plaintiffs. Absent such a showing, a genuine issue of material facts exists as to whether Defendant's calls were impermissibly made with a prerecorded voice.

### C. Whether Richardson Provided Express Consent to Receive Calls.

Defendant also moves for summary judgment on Richardson's claims, arguing he provided prior express consent to receive calls about Defendant's service. The TCPA permits calls to a cellular device using an ATDS or an artificial or prerecorded voice when the "called party" provided "prior express consent." 47 U.S.C. § 227(b)(1)(A). Thus, express consent is a "complete defense" to an alleged violation of the TCPA. *Fleming*, 2018 WL 4562460, at *3 n.3. Verde argues that Richardson gave his express consent to be called about its services; Richardson contends that he did not.

Defendant first references the declaration of Miten Bhadania, a Fluent employee, in which she attests that: on October 29, 2015 an internet user visited a Fluent-run promotional website; the user registered by entering the name "Brian Richardson;" the user entered a physical address, which Richardson later confirmed corresponded to his then-fiancée's address; the user entered a phone number, which Richardson later confirmed was his phone number; the user entered an email address, which Richardson later confirmed belonged to him and his fiancée; and, the user submitted a TCPA consent form. Second, Defendant refers to Richardson's deposition in which he testified that, while he did not specifically recall registering on Fluent's site and signing the TCPA consent form, he did recall completing some survey form on October 29, 2015, which "may have" been the one run by Fluent. Richardson also testified that nobody else but he and his fiancée knew of the email address that was entered into Fluent's website. Taken together, Defendant argues that Bhadania's declaration and Richardson's own testimony establish that no reasonable jury could find that anybody other than Richardson submitted the TCPA consent form.

The evidence tendered by Verde, however, does not warrant entry of summary judgment

in its favor.  First, Bhadania's declaration:  While her statements are entirely consistent with

Verde's theory that Richardson submitted the consent form, they are also consistent with

Richardson's theory that "a different person (or algorithm or 'bot') in possession" of his contact

information filled out the online registration.  Where, as here, "opposing parties tell two different

stories," the Court must accept the non-movant's version of events, unless it "is blatantly

contradicted by the record."  *Scott*, 550 U.S. at 380.  The Bhadania Declaration fails to establish

such a contradiction—the evidence it proffers is not "so overwhelming that no reasonable jury

could disbelieve" Richardson's account.  *Chladni v. Univ. of Phoenix, Inc.*, 2016 WL 6600045,

at *6 (E.D. Pa. Nov. 7, 2016).

    Neither does Richardson's testimony, when construed in the light most favorable to him,

establish that he gave his express consent to the calls.  In his deposition, Richardson stated that

he "may have" signed the TCPA consent form.  Thus, he, unlike the other named Plaintiffs, did

not outright deny that it was he who went to that site, supplied the personal information, and

submitted the TCPA consent form.  But, while Richardson did not use the magic words "I deny,"

he also did not admit to submitting the form.  Rather, he testified only that he "may have" done

so.  When construed in the light most favorable to the non-movant, that statement does not

amount to an admission that it was he who submitted the form and, thus, it was he who provided

express consent to the calls.  *Scott*, 550 U.S. at 380 ("[C]ourts are required to view the facts and

draw reasonable inferences in the light most favorable to the party opposing the motion.").

    Nor does Richardson's testimony about his email address establish that he was the user

that registered on Fluent's site.  True enough, Richardson stated that nobody other than his

fiancée knew of the email address used to register on the Fluent site.  When read in context,

however, it appears that Richardson meant that no one else had *access* to the account—not that

the address was wholly unknown to anyone beside him and his fiancée. After all, it would make little sense for a person to have an active email account that no other person or entity knew of. Moreover, it would appear unlikely that, as Defendant's theory suggests, Plaintiff never gave the email address out to anyone up until October 5, 2015, when he then used it to register for an online survey.

Thus, the question of whether Richardson provided prior express consent to the calls remains an open question and Verde's motion for partial summary judgment against Richardson shall, accordingly, be denied.

## IV.    Motion to Strike

Finally, Defendant moves to strike the class allegations in Plaintiffs' Amended Complaint. Plaintiff seeks to certify two putative classes: (1) the "ATDS Class," consisting of all individuals who received a call from Defendant "through the use of an automatic telephone dialing system, or pre-recorded voice, or any other device having the capacity to dial numbers without human intervention;" and (2) the "IDNC Class," consisting of all individual who "after notifying Defendant that they no longer wished to receive calls from or on behalf of Defendant, received one or more calls from or on behalf of Defendant." Defendant argues the class allegations should be struck because the "claims are inherently incapable of class certification."

To begin, the Court's resolution of Defendant's motion for partial summary judgment moots a portion of the motion to strike because Plaintiffs' claims based on the alleged use of an ATDS will be dismissed. Thus, the ATDS Class's allegations concerning the use of an ATDS will also be dismissed.[8]

---

[8] To be clear, the Court's resolution of Defendant's motion for partial summary judgment does not affect the ATDS Class's allegations concerning calls made using a prerecorded voice; nor does it affect the IDNC Class allegations.

Defendant's claim that the remaining class allegations should be struck, however, is unavailing. Defendant's briefing is not entirely clear about what procedural mechanism it is relying upon to strike the class allegations. There appear to be two candidates. First, Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Striking a pleading "is a drastic remedy to be used sparingly because of the difficulty of deciding a case without a factual record." *Dann v. Lincoln Nat. Corp.*, 274 F.R.D. 139, 142 (E.D. Pa. 2011) (quoting *BJ Energy, LLC v. PJM Interconnection, LLC*, 2010 WL 1491900, at *1 (E.D. Pa. Apr. 13, 2010)) (internal quotation marks omitted). Moreover, Rule 12(f) "'is not meant to afford an opportunity to determine disputed and substantial questions of law.'" *Id.* (quoting *N. Penn. Transfer, Inc. v. Victaulic Co. of Am.*, 859 F.Supp. 154, 158 (E.D. Pa. 1994)).

The second candidate is Rule 23(d)(1)(D), which—like all of Rule 23—specifically concerns class actions. Rule 23(d)(1)(D) permits a court to "issue orders that require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." Fed. R. Civ. P. 23(d)(1)(D). Motions to strike class allegations under 23(d)(1)(D) "are generally resolved after a motion for class certification is filed." *Berk v. J.P. Morgan Bank, N.A.*, 2011 WL 4467746, at *8 (E.D. Pa. Sept. 26, 2011). Indeed, several courts have held that motions to strike under Rule 23(d)(1)(D) are premature when filed prior to a motion for class certification because a motion to strike is "for all practical purposes, identical to an opposition to a motion for class certification." *Korman v. The Walking Co.*, 503 F.Supp.2d 755, 762-63 (E.D. Pa. 2007); *see also Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 284 F.R.D. 238, 244 (E.D. Pa. 2012); *Berk*, 2011 WL 467746, at *8. In considering class certification, the Third Circuit has instructed district courts to engage in a "rigorous analysis" to

determine whether "the requirements of Rule 23 have been satisfied." *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 93 (3d Cir. 2011). Engaging in such a "rigorous analysis" is generally inappropriate absent "[d]iscovery and full briefing on the merits of class certification." *Goode*, 284 F.R.D. at 245.

Whether proceeding under Rule 12(f) or Rule 23(d)(1)(D), Defendant has failed to establish that striking Plaintiffs' remaining class allegations is appropriate. The gist of Defendant's argument is that the class allegations will not meet the certification requirements of Rule 23. But, that is a "disputed and substantial question[] of law," *Dann*, 274 F.R.D. at 142, that should not be resolved using a Rule 12(f) motion to strike. Certainty, given that Plaintiffs have not yet moved to certify the classes, striking the class allegations pursuant to Rule 23(d)(1)(D) at this stage of the litigation would be premature. *See Korman*, 503 F.Supp.2d at 762. The Court declines to engage in the "rigorous analysis" required to determine whether class certification is appropriate without full briefing on class certification. That is especially the case where, as here, Plaintiffs have not had the opportunity to engage in class discovery—initial discovery was limited to the claims of the named Plaintiffs only. *Cf. Landsman & Funk*, 640 F.3d at 93 (noting that "in most cases, some level of discovery is essential" to determine whether class certification is appropriate). Defendant's motion to strike the class allegations will be denied.

An appropriate order follows.

**December 14, 2018**

                                        **BY THE COURT:**

                                        /S/WENDY BEETLESTONE, J.
                                        _____
                                        **WENDY BEETLESTONE, J.**